UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 1:20-CR-868 |
| | § | |
| JESUS FERNANDO RAMIREZ | § | |

## ORDER AND OPINION

Defendant Jesus Fernando Ramirez moves to dismiss the Superseding Indictment, arguing that the Government's removal of juvenile C.F.A.L. from the United States constituted a violation of Ramirez's right to present a complete defense, as the Government knew when it deported C.F.A.L. that the minor possessed exculpatory information as to Ramirez. (Motion, Doc. 66, 7) The Government disputes the weight of C.F.A.L.'s knowledge, and responds that it had no choice but to remove him as he was a minor not charged with a crime. (Response, Doc. 73, 3—4)

Based on the record and the applicable law, the Court finds that the nature of C.F.A.L.'s removal violated Ramirez's constitutional rights and warrants dismissal of the Superseding Indictment.

**I.     Relevant Background**

On the morning of Wednesday, December 2, 2020, a Border Patrol agent in his patrol vehicle began following a dark GMC Yukon for suspicion of transporting undocumented aliens. The Yukon traveled for a few minutes and ultimately stopped in front of a home. The back doors and passenger door opened and several men exited and began running. Border Patrol agents apprehended the men, as well as the driver, Defendant Jesus Fernando Ramirez. These preceding facts are largely undisputed.

From the moment of his arrest, Ramirez has maintained that he was in the wrong place at the wrong time and was merely trying to help a young man. After being taken into custody, Ramirez signed a written acknowledgement of his *Miranda* rights and agreed to provide a statement without his attorney present. In that statement, he claimed that on the morning of

December 2, he was driving his Yukon to his mother's home to pick up his brother. As he drove, he saw a student-aged young man waiving him down. Ramirez stopped. The juvenile, C.A.F.L., asked if Ramirez could give him a ride to the nearby school. When Ramirez agreed, C.A.F.L. boarded the vehicle, along with five other people, some of whom were not minors. As Ramirez began to drive, he noticed that a Border Patrol vehicle started to follow them. Ramirez claims that at that moment, he began to think the individuals in his vehicle could be undocumented aliens. He panicked and drove to his mother's home. When he stopped, the people in the vehicle jumped out and ran.

The Government questioned at least three of the detained undocumented aliens, including C.F.A.L. and two adult men, Juan Antonio Ramirez-Rojas and Carlos Alberto Servin-Sanchez. Border Patrol Agent Gilbert Briones interviewed C.A.F.L., who indicated that he was 16 years old. C.A.F.L. told Agent Briones that the man who picked them up in the Yukon was not the load driver. C.A.F.L. had made telephone contact with the load driver that morning, but the load driver did not show up at the time of the illegal crossing.[1] Improvising, C.A.F.L. waived down the Yukon and asked the driver (Ramirez) for a ride.

Border Patrol agents also questioned Ramirez-Rojas and Servin-Sanchez. They shared that before the group crossed the Rio Grande River that morning, they had been told that a dark SUV would pick them up. The Government arranged for the deposition of Servin-Sanchez. He testified that he understood that "a black truck . . . was going to pick us up", but that Ramirez "was not the person that was the one that was supposed to pick us up." (Servin-Sanchez Dep., Doc. 66-4, 66) According to Servin-Sanchez, "it just happened that [Ramirez] passed by and the guide found [him] . . . and he gave us a ride." (*Id.*) According to Servin-Sanchez, Ramirez "passed by there by chance". (*Id.* at 67)

---

[1] The Government obtained possession of two of Ramirez's cell phones and his written consent to search them. The call logs showed no incoming or outgoing phone calls that morning. Agents only found an outgoing Facebook Messenger call to Ramirez's brother.

After interviewing C.A.F.L., the Government confirmed that no criminal charges were pending against him. Because he was a minor, U.S. Customs and Border Protection transferred C.F.A.L. to the custody of the Mexican Consulate, and then it appears he was granted a voluntary removal to Mexico. The transfer occurred only a few hours after Border Patrol took C.F.A.L. into custody. (Transfer, Doc. 79)

II. **Procedural History**

On December 3, 2020, the Government filed a Criminal Complaint against Ramirez. (Complaint, Doc. 1) That day, the Government also filed a material witness affidavit as to Servin-Sanchez and Ramirez-Rojas. (Material Witness Aff., Doc. 3)

On December 14, the Government filed an initial Indictment, charging Ramirez with three counts: 1) conspiring to transport individuals who entered and remained in the United States illegally; and 2) two counts of transporting an individual (each of the retained material witnesses) for financial gain. (Indict., Doc. 9) After the Magistrate Judge ordered the release of material witness Ramirez-Rojas due to medical issues, the Government moved for dismissal of count three. (Order Granting Motion, Doc. 45)

On March 2, 2021, the Government filed a Superseding Indictment, charging Ramirez with a single count:

> Jesus Fernando Ramirez, knowing or in reckless disregard of the fact that Carlos Alberto Sevin-Sanchez [the remaining material witnesses] was an alien who had come to, entered, and remained in the United States in violation of law, did transport and move, and attempt to transport and move, such alien within the United States by means of transportation and otherwise, in furtherance of such violation of law[, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(1)(B)(ii)].

(Sup. Indict., Doc. 46)

On March 25, Ramirez moved to dismiss the Superseding Indictment. (Motion, Doc. 66)

III. **Analysis**

Ramirez argues that the Government removed C.F.A.L. with knowledge that the minor possessed exculpatory information. As a result, according to Ramirez, the Government violated

his rights to due process under the Fifth Amendment, his rights to compulsory process and confrontation under the Sixth Amendment, and his rights under *Brady*. (Motion, Doc. 66, 6—7) As part of his argument, Ramirez contends that C.F.A.L.'s statement to Agent Briones aligned in material respect with Ramirez's defense—i.e., C.F.A.L. confirmed that Ramirez was not the load driver, and C.F.A.L. stated that he waived Ramirez down because the load driver had not appeared. By removing C.F.A.L. from the country before Ramirez could interview him and arrange for his deposition, the Government undermined Ramirez's ability "to present a complete defense by deporting a witness it knew could give exculpatory evidence." (*Id.* at 7) Ramirez posits that C.F.A.L.'s testimony would "undermine[] the Government's case against Mr. Ramirez" and there is "a reasonable probability that the proceeding" would differ if C.F.A.L. were available. (*Id.*)

### A. Applicable Standard

The Supreme Court has long recognized that Congress may adopt "a policy of apprehending illegal aliens at or near the border and deporting them promptly." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982). Several "practical considerations" justify "the prompt deportation of alien witnesses who are determined by the Government to possess no material evidence relevant to a criminal trial". *Id.* at 865.

At the same time, the United States Constitution protects a criminal defendant's right to "compulsory process for obtaining witnesses in his favor". *Id.* at 867. And the Fifth Amendment's guarantee of due process requires that defendants "be treated with 'that fundamental fairness essential to the very concept of justice.'" *Id.* at 872 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). A defendant's due process rights under the Fifth Amendment include that the Government will disclose any exculpatory information to the defendant that is within the Government's possession, custody, or control. *See Brady v. Maryland*, 373 U.S. 83 (1963). The Government's violation of any of these rights can lead to sanctions, including dismissal of charges against a defendant. *See Valenzuela-Bernal*, 458 U.S. at 873—74.

In *Valenzuela*, the Supreme Court considered the interplay between the Government's

ability to deport undocumented aliens and a defendant's rights that may be implicated by information that the deported alien possesses. The Supreme Court concluded that "[s]anctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Id.* at 873; *see also United States v. Perez*, 217 F.3d 323, 326 (5th Cir. 2000) ("Because of its duty to execute the immigration policy adopted by Congress, the government may deport undocumented alien witnesses upon a good-faith determination that they possess no information favorable to a criminal defendant."). Although some circuit courts also require that a defendant show that the Government acted in bad faith when deporting an undocumented alien who possesses exculpatory information, the Fifth Circuit has not done so. *See, e.g.*, *United States v. Hernandez*, 347 F. Supp. 2d 375, 380—81 (S.D. Tex. 2004) (summarizing variance among circuit courts). The Fifth Circuit, in a decision that predates *Valenzuela*, explained that defendants also "have a constitutional right to interview such witnesses, and must be given reasonable notice before their deportation". *United States v. Avila-Dominguez*, 610 F.2d 1266, 1270 (5th Cir. 1980).

### B. Application

In the present matter, the record demonstrates that the probable testimony of C.F.A.L. would have been material and favorable to Ramirez's defense, in ways not merely cumulative to the testimony of available witnesses. The Memorandum of Investigation records a summary of the statements that C.F.A.L. communicated to Agent Briones. Several of those statements closely corroborate Ramirez's primary defense in this matter—i.e., he picked up C.F.A.L. because he saw a student-aged young man waiving him down and asking him for a ride. Not only do C.F.A.L.'s statements confirm that Ramirez was not the intended load driver, they also buttress Ramirez's claim that because a high school was nearby, he believed C.F.A.L. was a student who wanted a ride to the campus. C.F.A.L.'s possible testimony could create reasonable doubt as to the sole count in the Superseding Indictment—i.e., whether Ramirez transported Sevin-Sanchez within

the United States knowing or in reckless disregard of the fact that he was an alien who had come to, entered, or remained in the United States in violation of law.

In addition, the Court finds that C.F.A.L.'s statements to Agent Briones immediately placed the Government on notice that C.F.A.L. possessed information exculpatory to Ramirez. In the context of an arrest of undocumented aliens, the Government knew that the driver of the vehicle could be charged with a human smuggling offense. In fact, in Agent Briones's Memorandum of Investigation, he identifies Ramirez as "the load driver/principal". (Memo, Doc. 73-1, 9) And law enforcement told Ramirez's brother that he could not recover his tools from the impounded Yukon because of "the pending case against Ramirez". (*Id*. at 10) Thus, although the Government had not obtained an Indictment or filed a Complaint against Ramirez when it interviewed C.F.A.L. and arranged for his prompt removal, the Government knew that C.F.A.L. possessed information material to Ramirez's defense.

The Government challenges the conclusion that C.F.A.L. possessed exculpatory information for the current charge. In particular, the Government argues that C.F.A.L.'s statements are not exculpatory as to whether Ramirez transported Sevin-Sanchez with reckless disregard of the fact that Sevin-Sanchez was an undocumented alien in violation of the law. (Response, Doc. 73, 4) Based on the record, however, the Court finds this argument unpersuasive. It is true that Agent Briones's summary of C.F.A.L.'s statements do not reference Sevin-Sanchez, or whether C.F.A.L. made any reference to the immigration status of himself or any of the people who boarded the Yukon. But Ramirez was entitled to know that C.F.A.L. corroborated his story— i.e., that he was not the load driver and that C.F.A.L. had waived Ramirez down to ask him for a ride. This initial exchange colors the entire event, which lasted only a few minutes, and which consisted of Ramirez picking up the passengers, a brief drive, and the eventual flight of the undocumented aliens after the vehicle stopped. (Servin-Sanchez Dep., Doc. 66-4, 57 (testifying that he was in Ramirez's vehicle for three to five minutes)) Depriving Ramirez of the ability to present C.F.A.L.'s testimony prohibits him from providing valuable context to that morning, as

well as an explanation of why Ramirez allowed the individuals to board his vehicle in the first place. In fact, absent C.F.A.L.'s testimony, Ramirez has no manner to present his account of the events on the morning in question, other than to take the stand in his own defense and forego his constitutional right to remain silent. The Government's decision to remove C.F.A.L. forces this decision on Ramirez. *See, e.g., Hernandez*, 347 F. Supp. 2d at 388 (granting the defendant's motion to dismiss because, in part, the Government's deportation of a witness with exculpatory information meant that the defendant "would have no choice but to testify, waiving his right not to do so, in order to rebut" the evidence the Government would present).[2]

The Government also argues that Ramirez has not shown that C.F.A.L.'s testimony would be relevant to any affirmative defense. (Response, Doc. 73, 5 (relying on *United States v. Vasquez-Hernandez*, 924 F.3d 164 (5th Cir. 2019))). That decision, however, does not support the Government's argument. In that case, undocumented aliens convicted of the misdemeanor of improper entry into the United States challenged their convictions on the grounds that the Government had separated them from their children during the prosecution, and in doing so had precluded them from presenting the children's testimony to support an affirmative defense of duress. The Fifth Circuit affirmed the denial of the motions to dismiss, explaining that the children's possible testimony about conditions in the defendants' home countries "would not have established an affirmative defense of duress". *Vasquez-Hernandez*, 924 F.3d at 171. That analysis, however, did not limit a consideration of exculpatory evidence and the Government's obligations under *Brady* to affirmative defenses. The *Vasquez-Hernandez* court framed the analysis in terms of an affirmative defense because that is the argument that the appellants had advanced. In contrast, Ramirez claims—and has demonstrated—that the Government knew that C.F.A.L. possessed non-cumulative information that was material and favorable to Ramirez as to

---

[2] Material witness Sevin-Sanchez did testify that Ramirez was not the load driver and "passed by there by chance". (Sevin-Sanchez Dep., Doc. 66-4, 66) But Sevin-Sanchez did not overhear C.F.A.L.'s initial conversation with Ramirez, precluding his ability to testify as to the important exchange that led Ramirez to allow the individuals aboard. And in any event, Sevin-Sanchez's testimony as to what C.F.A.L. told Ramirez would be hearsay.

the elements that the Government has to prove beyond a reasonable doubt to support a conviction. The Constitutional rights at issue in *Valenzuela* apply whether the deported individual possesses information related to a defendant's affirmative defense or to the Government's ability to meet its evidentiary burden in its case-in-chief.

The Government also responds that as C.F.A.L. was a juvenile with no pending criminal charges, the Government "had no choice" but to remove him under existing Department of Homeland Security Protocol. (Response, Doc. 73, 3) This argument would have considerable force if controlling caselaw required that Ramirez demonstrate bad faith on the Government's part. The record suggests no such bad faith; it appears to the Court that the Government removed C.F.A.L. as a matter of course when it determined that he was a minor with no criminal charges. But as the Court has explained, the law in this circuit does not require a showing of bad faith. The issue is not whether the Government acted with good or bad faith in removing an undocumented alien, but whether when doing so, the Government knew that the individual possessed non-cumulative information material and favorable to a suspect's defense. It knew as much, but chose to grant C.F.A.L. a voluntary removal, placing him beyond the reach of the Court's subpoena power. And it did so without any notice to Ramirez.

In addition, the Government points to no statute or regulation requiring C.F.A.L.'s immediate removal, which occurred within hours of his being taken into custody. The Court has located no such requirement, and notes that some authority indicates that the Government possesses the ability to retain juvenile material witnesses. *See, e.g., United States v. Abundis-Carreon*, No. CR C-12-169, 2012 WL 1223838 (S.D. Tex. Mar. 15, 2012) (reporting that three juvenile material witnesses remained in custody more than a month after being detained). The Government has not demonstrated that it was legally obligated to remove C.F.A.L. immediately, rather than detain him for a brief period to notify Ramirez that C.F.A.L. possessed exculpatory information. While the Government "may deport undocumented alien witnesses upon a good-faith determination that they possess no information favorable to a criminal defendant", *Perez*,

217 F.3d at 326, the Government cannot say that it made such a determination in this case. In fact, the record proves otherwise.

## IV. Conclusion

Accordingly, it is:

**ORDERED** that Defendant Jesus Fernando Ramirez Motion to Dismiss Indictment (Doc. 66) is **GRANTED;** and

**ORDERED** that the Superseding Indictment (Doc. 46) is **DISMISSED.**

Signed on May 12, 2021.

Fernando Rodriguez, Jr.
United States District Judge